UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-81719-CIV-MATTHEWMAN

CHARLES MICHAEL HENNESSY II,

      Plaintiff,

v.

ANDREW SAUL,
Acting Commissioner of Social Security,

      Defendant.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 14, 15]

**THIS CAUSE** is before the Court upon Plaintiff, Charles Michael Hennessy II's ("Plaintiff") Motion for Summary Judgment with Supporting Memorandum of Law [DE 14], and Defendant, Andrew Saul, Acting Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment with Supporting Memorandum of Law [DE 15]. The issues before the Court are whether the record contains substantial evidence to support the denial of benefits to Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I.    FACTS

On December 4, 2016, Plaintiff filed a claim for disability insurance benefits, alleging disability beginning on September 14, 2016. [R. 10][1]. Plaintiff's claim was denied at all administrative stages. [R. 7]. A hearing was held before the ALJ on October 2, 2018. [R. 28]. The

_____

[1] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 8.

Administrative Law Judge ("the ALJ"), Patrick Kilgannon, issued a decision on October 23, 2018, denying Plaintiff's request for benefits. [R. 7]. Plaintiff requested review of the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on October 25, 2019. [R. 1-4].

## A.  Hearing Testimony

Plaintiff was first questioned by the ALJ. Plaintiff was 41 years old at the time of the hearing. [R. 33]. Plaintiff stated that he completed two years of college. *Id*. Plaintiff stated that the last time he worked was on September 14, 2016, as a police officer with the New York Police Department ("NYPD"). *Id*. He had worked at this job for 17 years. [R. 34]. His claim is based upon an injury that he incurred on January 12, 2015, when a taxicab crashed into his patrol car multiple times. *Id*. His current source of income is a disability pension from NYPD. [R. 33].

Plaintiff next described the approximately 20-month period where he continued to work for NYPD on limited duty. [R. 36]. During a typical eight-hour workday, Plaintiff completed desk duty and clerical work. *Id.* He did not wear a gun belt or uniform due to pain caused by bending his legs. *Id*. He was able to take two or three breaks in addition to an hour for lunch. *Id*. Because his injury was suffered while he was in the line of duty, NYPD allowed Plaintiff to take naps at work, which helped Plaintiff tolerate the medications he was on. [R. 37-38].

Plaintiff then discussed his symptoms and pain. Plaintiff stated that he could only walk approximately one city block before he started feeling severe burning sensations in his legs that become unbearable. [R. 38]. Plaintiff has a spinal cord stimulator, which is the last remaining treatment for his reflex sympathetic dystrophy syndrome ("RSD"). *Id*. In addition to the spinal cord stimulator, Plaintiff has received multiple epidurals, ketamine infusions, and physical therapy. [R. 38]. None of these therapies were successful in treating Plaintiff's pain, so he moved to Florida

2

to avoid cold weather, which exacerbated his pain. [R. 39]. He currently takes Tramadol and Tylenol #3 with codeine about every other day. [R. 40]. They cause drowsiness and upset stomach. *Id*. The medication and pain cause Plaintiff to be unable to concentrate on whatever task he is doing. *Id*.

Plaintiff next discussed his typical day in Florida. He wakes up around 6:00 a.m. [R. 40]. He gets his kids ready for school by preparing meals for them. *Id*. If he is feeling up to it, he drives his kids to school. *Id*. He then comes home, runs any errands, if he is able, and then becomes physically exhausted and takes a nap. *Id*. Once his kids get home from school, Plaintiff helps them with their homework and tries to attend their school events. *Id*.

Next, Mr. Linder, the Vocational Expert ("VE"), testified. The VE described Plaintiff's past work as a police officer, with an SVP of 6. [R. 41]. The VE classified the exertion as medium. *Id*. The ALJ then asked the VE if Plaintiff's past work as a police officer is out of the question, which the VE testified that it was. [R. 41-42].

The VE then testified that there would be other representative jobs that a hypothetical person with the same age, education, and work experience as Plaintiff could perform in the local, regional, or national economy. [R. 42]. The VE testified that these included: call-out operator, with an SVP of 2, sedentary exertion, in the amount of 5,240 potential jobs; document preparer for microfilming, with an SVP of 2, sedentary exertion, in the amount of 46,565 potential jobs; and toy stuffer, with an SVP of 2, sedentary exertion, in the amount of 4,173 potential jobs. *Id*.

Plaintiff's counsel then asked the VE several questions. [R. 44]. Counsel asked the VE if a person with two or three unscheduled absences per month would be able to do any of the jobs listed above. [R. 44]. The VE stated that the hypothetical person could do none of the jobs. *Id*.

Counsel then asked the VE if a person taking frequent breaks amounting to 15% of the day would be able to do any of the jobs listed above. *Id*. The VE stated that the hypothetical person could do none of the jobs. *Id*.

B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized below.

On the day of the accident, Plaintiff was taken to the emergency room at New York Presbyterian Hospital. [R. 210]. He complained of neck, back, and right hand pain. *Id*. On examination, there was tenderness from his cervical spine to the lumbar spine. [R. 212]. There was an abrasion on his right medial malleolus, and tenderness in his right ankle. *Id*. He was sent for a CT scan of his head and neck, and x-rays of other areas. *Id*. X-rays indicated no acute osseous injury of the cervical, thoracic, or lumbar spine. [R. 216]. Plaintiff was discharged and told to follow up with his primary doctor. [R. 222].

On January 19, 2015, Plaintiff was seen by Dr. Tim Canty at the Comprehensive Spine and Pain Center of New York. [R. 302]. Dr. Canty stated that after the emergency room visit on the date of the accident, Plaintiff developed, over the next two to three days, severe increasing low back, mid back, and leg pain. *Id*. He presented to Dr. Canty with bilateral lower back pain, right greater than left. *Id*. The pain radiated down the right lateral leg and central/interior thigh, stopping at mid-thigh. *Id*. The pain was constant and described as shooting and was made worse by sitting. *Id*. Plaintiff also noted generalized foot paresthesia since the accident. *Id*. He rated his pain as an 8/10. *Id*. His mid back pain was rated as 5/10. *Id*. Dr. Canty noted that Plaintiff had persistent pain. *Id*. On examination, Dr. Canty stated that Plaintiff appeared in moderate distress. [R. 303].

Palpation of the lumbar area right and left demonstrated severe tenderness/palpable paraspinal muscle spasms. *Id.* There was also thoracic T6-T9 paraspinal tenderness and spasm. *Id.* Range of motion was 30 degrees flexion out of 60 degrees; 5 degrees extension out of 25 degrees; and 5 degrees left and right rotation out of 25 degrees. *Id.* Straight leg raise was negative on the left but positive at 60 degrees on the right. *Id.* Muscle strength was 5/6 for all lower extremity muscle groups but generalized 4/5 right lower exam limited by pain. *Id.* Dr. Canty diagnosed acute lumbar radiculopathy, low back pain, pain in thoracic spine, and myalgia and myositis. *Id.* He wanted Plaintiff to start physical therapy and gave Plaintiff trigger point injections on that day due to his muscle spasm/tender points. *Id.*

On January 21, 2015, Plaintiff underwent an MRI of his lumbar spine at the request of his chiropractor. [R. 246]. Plaintiff had been complaining of pain in the lower back radiating into the right leg with difficulty walking. *Id.* The MRI revealed at L4/5 a broad posterior subligamentous disc herniation impressing on the thecal sac, encroaching peripherally left greater than right into the foramen accompanied by left posterolateral radial annular tear; and at L5/S1 there was a 1 mm retrolisthesis with a focal midline subligamentous disc herniation impressing on the ventral margin of the thecal sac in the midline. *Id.*

On February 2, 2015, Plaintiff was seen by neurologist, Dr. Salvatore Palumbo. [R. 426-427]. Plaintiff complained that any form of upright physical activity exacerbated his low back pain radiating through the buttock and posterolateral aspect of his right leg. [R. 426]. Sitting was uncomfortable. *Id.* He complained of numbness and tingling in his right foot. *Id.* On examination, he was in mild distress. *Id.* He was unable to hyperextend or forward flex his low back due to pain. *Id.* Palpation anywhere along the midline and paraspinous regions at the lumbosacral junction was

very tender. *Id*. Power was diminished in his right foot in both dorsi and plantar flexion. *Id*. Dr. Palumbo interpreted the lumbar MRI as showing mild degenerative disc changes at L5-S1 with a small central disc herniation. *Id*. Dr. Palumbo described Plaintiff's pain as considerable axial inflammatory pain, as well as what appeared to be severe radiculopathic pain in the right lower extremity. *Id*. However, he did not feel Plaintiff's imaging was sufficiently compelling for surgical interventions. [R. 427]. He suggested EMG and nerve conduction studies to show any underlying pathology that imaging was missing. [R. 426]. He also suggested oral steroid to help cool the neural inflammation. [R. 427].

On February 25, 2015, Plaintiff was seen at St. Catherine of Siena Medical Center by Dr. Paul Taglienti. [R. 248]. He was diagnosed with cold right foot, nerve disorder, and lumbar nerve root disorder. *Id.* He was prescribed Percocet and Tramadol. [R. 248-249]. Arterial tests did not indicate any stenosis or deep vein thrombosis. [R. 251].

On March 3, 2015, Plaintiff was seen at the New York Spine Institute. [R. 256]. He was complaining of back pain which radiated into the lower right extremity. *Id*. By that time, he had undergone conservative care, including physical therapy and trigger point injections. *Id*. The lumbar MRI was reviewed as showing a broad disc herniation at L4/5 level. *Id*. On examination, there was tenderness to palpation in the lumbar spine. *Id*. There was also evidence of bilateral paraspinal musculature spasm. [R. 257]. There was decreased and painful range of motion. Flexion was at 30 degrees, extension 20 degrees, left lateral flexion at 20 degrees, and right lateral flexion at 20 degrees. *Id*. Dr. Alexandre De Moura recommended lumbar epidural steroid injection. *Id.* He felt Plaintiff's prognosis was guarded. *Id.*

On March 19, 2015, Plaintiff was seen at the NYU Hospital for Joint Diseases for back and

6

leg pain by Dr. Thomas Errico. [R. 259]. Plaintiff was complaining of back pain and burning bilateral leg pain below the knee and distally. [R. 262]. He rated his back pain as 6/10 and his leg pain as 8/10. *Id.* The back pain radiated into the right lateral calf. *Id.* Plaintiff described that his leg sometimes became shiny and blue. *Id.* The pain was worsened by walking and relieved by laying down. *Id.* His sleep pattern had been interrupted. *Id.* He denied numbness and tingling in the left lower extremity. *Id.* He had tried physical therapy with minimal relief. *Id.* He was having difficulty with his daily activities. *Id.* On exam, he was able to toe walk and heel walk with mild difficulty. *Id.* Lumbar range of motion was limited to flexion and extension and limited to lateral rotation with some associated pain. [R. 263]. New x-rays were taken on that date. [R. 278]. After review of the x-rays and MRI, Dr. Errico stated that the back pain was likely musculoskeletal from trauma and the leg pain appeared to be possible nerve irritation and consistent with possible reflex sympathetic dystrophy syndrome ("RSD"). [R. 263]. Plaintiff was referred to rehabilitation for consideration of nerve blocks in conjunction with physical therapy. *Id.*

On March 27, 2015, Plaintiff was seen by Dr. Salvador Portugal at the Department of Physiatry of the NYU Langone Medical Center on referral from Dr. Errico. [R. 259, 267]. Dr. Portugal noted that Dr. Errico was an orthopedist and recommended non-surgical treatment. [R. 268]. Plaintiff complained of low back pain with radicular pain, numbness/paresthesias of both legs, right greater than left, without weakness affecting the limbs. [R. 267]. He complained that the pain was 7/10 and was aching, sharp, stabbing, tingling, throbbing, pinching or radiating to bilateral legs. *Id.* The pain initially began in the right side but had progressed to the left side and had been gradually worsening. *Id.* The pain occurred all day but was exacerbated by forward bending, prolonged sitting and walking, and alleviated by rest with his legs elevated. *Id.* He also

mentioned that his right leg turned shiny and blue at times. [R. 267-68]. Examination indicated pain with range of motion at end ranges of flexion and ipsilateral oblique extension bilaterally. [R. 269]. There was tenderness over bilateral paraspinal muscles and facet joints. *Id.* Dr. Portugal reviewed the x-rays and MRI and assessed low back pain with right-sided buttock and bilateral leg pain; likely lumbar radiculopathy given radicular complaints, positive dural tensions signs, and L4-5 and L5- S1 disc herniations on MRI; likely concomitant myofascial pain and/or facet-mediated pain; possible discogenic pain; and possible complex regional pain syndrome given subjective complaints of skin changes with dysthesias. *Id.* Plaintiff returned on April 8, 2015, for a second epidural lumbar injection. [R. 274].

On April 13, 2015, Plaintiff was seen by Dr. Canty. [R. 305]. Dr. Canty noted that trigger point injections done in January gave pain reduction of 80%, but only for 2 hours. *Id*. Plaintiff rated his current pain as 8/10. *Id*. Plaintiff noted burning sensation in both lower feet and skin changes in both feet, right greater than left, as they would become shiny and at times turn blue. *Id.* The pain was made worse by sitting. *Id*. Plaintiff was diagnosed with acute lumbar radiculopathy and a suggested evaluation for possible RSD of the right lower extremity after steroid injection. *Id.* He was prescribed Gabapentin. [R. 306]. Another trigger point injection was performed on that date. [R. 307].

Plaintiff returned to Dr. Canty on April 17, 2015. [R. 308]. Plaintiff reported that the trigger point injection gave 75% relief but lasted only a couple of hours. *Id*. Examination showed moderate tenderness/palpation paraspinal muscle spasm from T8-L5 plus trigger points. [R. 309]. Range of motion was still restricted. *Id*. Diagnoses included acute lumbar radiculopathy, lumbosacral spondylosis, displacement of lumbar intervertebral disc without myelopathy, pain in thoracic

spine, and RSD of lower extremity. *Id*. He was given a lumbar epidural steroid injection. [R. 310].

Plaintiff returned to Dr. Canty on May 11, 2015. [R. 311]. Plaintiff reported no improvement from the previous steroid injection. *Id.* He complained of his legs feeling like they were in hot water with swelling, and turning colors occasionally from bluish to red to white. *Id.* Plaintiff had taken Gabapentin but had to stop due to an allergic reaction which caused difficulty breathing. *Id*. Dr. Canty stated that insurance had approved nerve conduction studies, and he would seek approval for lumbar sympathetic blocks ("LSB") for the RSD. [R. 313]. On June 6, 2016, Plaintiff underwent a nerve conduction study. [R. 289]. This study showed evidence of peripheral neuropathy of the right lower extremity. [R. 290].

Plaintiff returned to Dr. Canty on June 15, 2015. [R. 314]. He rated his pain as 7- 8/10. *Id.* The pain was worsened by sitting. *Id*. His diagnoses on that date were RSD of the right leg, and RSD of lower extremity. [R. 315]. A nerve block injection was performed. [R. 316]. On June 29, 2015, Plaintiff reported that the nerve block performed on June 15 had resulted in a 60-70% pain reduction lasting only 3 hours. [R. 317]. The pain was rated at 8/10, and occurred bilaterally from the mid calves and radiated into all 10 digits in the feet. *Id.* The pain was described as burning with numbness. *Id*. The pain was worsened by sitting. *Id.* Dr. Canty performed another nerve block injection on that date. [R. 319]. On July 10, 2015, Plaintiff reported that he had had only 50% relief from the second nerve block, and it lasted only 2 hours. [R. 320]. Examination continued to show tenderness/palpation paraspinal muscle spasm from T8- L5 plus trigger points. *Id.* Range of motion was still restricted. [R. 321]. Dr. Canty performed a third nerve block. [R. 322]. On July 28, 2015, Dr. Canty stated that the third nerve block had provided 0% relief. [R. 324]. Plaintiff rated his pain on that date at 7/10. *Id.* Dr. Canty's physical examination remained the same. [R. 325]. Dr. Canty

administered an IV infusion with Ketamine and Lidocaine. [R. 326].

On July 29, 2015, Dr. Canty indicated that the spinal block provided Plaintiff with 50% relief. [R. 326]. However, his pain was still rated as a 7/10. [R. 327]. Another IV infusion with Ketamine and Lidocaine was administered. [R. 329]. On July 30, 2015, Dr. Canty noted that IV infusion number 2 had provided 40% relief. *Id.* Plaintiff's pain was now rated at 5/10. [R. 330]. Dr. Canty performed a third IV infusion. [R. 332]. On July 31, 2015, Dr. Canty reported that the third IV infusion provide 10% relief, 50% overall. [R. 333]. Plaintiff rated his pain as 5/10. [R 333]. Dr. Canty performed another IV infusion. [R. 335].

On August 3, 2015, Dr. Canty noted that the fourth infusion provided another 10% relief, total 60% relief. [R. 336]. Another infusion was administered. [R. 338]. On August 4, 2015, Dr. Canty noted 60% overall relief with the infusions. [R. 339]. Plaintiff rated his pain at 4/10. *Id.* Again, the pain was described as worsened by sitting. *Id.* Another infusion was performed. [R. 341]. On August 5, 2015, Dr. Canty noted 60% relief with the infusions. [R. 342]. Plaintiff still rated his pain at 4/10. *Id.* Another infusion was performed. [R. 344]. On August 6, 2015, Plaintiff's pain remained the same. [R. 345]. Another infusion was administered on August 7, 2015. [R. 347]. Dr. Canty reported 60% relief. [R. 348].

Plaintiff returned to Dr. Canty on August 24, 2015. [R. 351]. The previous infusions had provided 60% relief. *Id*. However, Plaintiff noted that his pain was 6/10 when it flared due to temperature or impact, and 3/10 when the RSD was not flaring. *Id.* Again, it was noted that the pain was worsened by sitting. *Id*. Examination remained the same with tenderness/palpation paraspinal muscle spasm from T8-L5 plus trigger points. *Id.* Range of motion was still restricted. [R. 352]. Dr. Canty noted that Plaintiff was still participating in desensitization physical therapy.

His pain flared when he bumped into things or with temperature change. [R. 353]. Dr. Canty stated that Plaintiff may need "5-day Ketamine infusions" or a spinal cord stimulator trial if the pain worsened. *Id.*

On September 14, 2015, Plaintiff returned to see Dr. Canty. [R. 354]. His pain was made worse by sitting. *Id.* He received a booster injection of Ketamine. [R. 354, 356]. He received more boosters over the next three days. [R. 359, 362, 365]. His pain levels remained the same. [R. 357, 360, 363]. On September 21, 2015, Plaintiff received another injection and was using a topical multimodal cream to relieve an aching pain. [R. 366]. Dr. Canty noted that Plaintiff's pain had increased with his return to work. [R. 368].

Plaintiff returned to see Dr. Canty again on October 8, 2015. [R. 369]. Plaintiff rated his pain as 5-6/10. *Id.* It was noted that showers and temperature changes exacerbated the pain. *Id.* Sitting for prolonged periods made the pain worse. *Id.* Examination remained the same. [R. 370]. Dr. Canty prescribed a spinal cord stimulator trial. [R. 371]. Plaintiff returned again on November 19, 2015, in the same condition. [R. 372]. A spinal cord stimulator trial was inserted. [R. 374-375].

On November 23, 2015, Dr. Canty noted that Plaintiff had a pain reduction of 25% from the trial. [R. 375]. The trial was to continue for one more day before deciding whether to implant the permanent stimulator. [R. 378]. By November 24, 2015, Plaintiff was reporting 80-90% relief with conversion to a different programming of the stimulator's signals. [R. 379]. The trial stimulator was removed. *Id.* On December 8, 2015, Plaintiff returned to Dr. Canty who performed another infusion of Ketamine. [R. 442].

On January 22, 2016, the permanent spinal cord stimulator (SCS) was implanted. [R. 384, 432, 434]. Dr. Canty saw Plaintiff on February 12, 2016, for reprogramming of the SCS. [R. 429].

11

He stated Plaintiff got about 80% relief from the SCS. *Id.* However, the pain was still made worse by sitting. *Id.* Dr. Canty encouraged Plaintiff to start strengthening and stretching exercises, such as yoga, swimming and pilates. *Id.* He did not recommend any heavy lifting and stated Plaintiff should refrain from lifting more than 10 pounds. [R. 431]. On November 4, 2016, Plaintiff saw Dr. Canty again for a reprogramming of the SCS. [R 446]. His pain was rated at 5/10. *Id.*

On December 6, 2016, Tim Golub, DPT, filled out a Request for Records sent to ABC Physical Therapy by the New York Office of Temporary and Disability. [R. 520-523]. Mr. Golub stated that Plaintiff suffered from complex regional pain syndrome, bilateral. [R. 521]. His findings on initial examination on March 13, 2015, were "severe 10/10 pain bilateral lower extremities." *Id.* He stated that Plaintiff was limited to short ambulation and frequent unweighting secondary to pain in his bilateral lower extremities. [R. 522]. He stated that Plaintiff would need a functional capacity determination to evaluate his limitations with regard to standing, walking, sitting, lifting, etc. *Id.* He indicated that Plaintiff's gait was significantly ataxic due to pain with weightbearing. [R. 525].

On December 27, 2016, Plaintiff was seen for a consultative examination, at Defendant's request, by Dr. Kanista Basnayake. [R. 529-532]. Dr. Basnayake stated that Plaintiff had been in a work-related car accident causing back pain treated by physical therapy and chiropractic treatment. [R. 529]. Dr. Basnayake reported that Plaintiff said the stimulator helped for his burning pain in both legs. *Id.* However, he was in constant pain on the scale of 4-5/10. *Id.* The pain got worse with cold weather, when the pain was 9/10. *Id.* The pain got better in warm weather, and with warm baths and medication. *Id.* His activities including cooking two to three times a week, laundry two to three times a week, shopping five times a week, childcare seven days a week,

showering seven days a week, and dressing seven days a week. [R. 530]. Dr. Basnayake stated that Plaintiff walked with a very mild limp in the right leg, and he could walk on heels and toes with difficulty. *Id*. He could squat half of full and used no assistive devices. *Id*. He needed no help changing for the exam or getting on and off the exam table. *Id*. He could rise from a chair without difficulty. *Id*. Examination of the lumbar spine showed flexion at 60 degrees, extension at 20 degrees, lateral flexion at 20 degrees bilaterally, and rotation at 20 degrees bilaterally. *Id.* Dr. Basnayake cited increased sensation mid-calf and distal area of both legs, including ankle and feet. *Id.* Dr. Basnayake noted a loss of hair in the lower legs. [R. 531]. Dr. Basnayake diagnosed lower back pain and RSD of both lower legs, mid-calf down, including feet and ankles. [R. 532]. Dr. Basnayake opined that Plaintiff had moderate limitation for prolonged standing, walking, climbing, bending, lifting, carrying, and kneeling. *Id.*

On January 19, 2017, Dr. Canty completed a Medical Source Statement at the request of Defendant. [R. 533-540]. He indicated he first examined Plaintiff on January 19, 2015 and last examined him that day. [R. 533]. He saw him an average of 2-3 times per month. *Id.* His diagnoses were RSD of lower extremity, acute lumbar radiculopathy, displacement of lumbar intervertebral disc without myelopathy, lumbosacral spondylosis, myalgia, and myositis. *Id.* For prognosis, he stated that "we hope through the spinal cord stimulator it will provide long term relief." *Id*. He noted that there was swelling in the lower extremities. [R. 534]. He listed Plaintiff's primary symptoms as pain radiating in the mid-calves down into all 10 digits of the feet, associated with burning and numbness. [R. 535]. The pain was constant with exacerbations with wet and cold climate and lifting heavy objects. *Id.* He opined that in an 8-hour competitive full-time work environment, Plaintiff could sit for 0-1 hours and stand/walk for 0-1 hours. [R. 536]. Plaintiff could

only occasionally lift and carry up to 20 pounds. *Id*. He would have significant limitations in doing repetitive reaching, handling, fingering and feeling. [R. 537]. He was currently taking Tramadol and Omeprazole. *Id.* His pain, fatigue or other symptoms would frequently interfere with attention and concentration. *Id*. Stress exacerbated his pain. *Id*. He was only capable of low stress work, and pain would be exacerbated by multi-tasking. [R. 538]. Dr. Canty stated that pain would interfere with Plaintiff's ability to keep his neck in a constant position and that he would likely be absent more than three times per month. [R. 539].

On January 19, 2017, Plaintiff was seen by Dr. Canty for reprogramming of his SCS. [R. 673]. He got about 80% relief from the SCS and rated his pain as a 1/10. [R. 673]. On April 4, 2017, Plaintiff returned to see Dr. Canty. [R. 671]. His pain was reported at 4-5/10. *Id.* He was getting good coverage by the SCS. *Id.* He was also having significant neck pain rated at 1/10. *Id*. His current medications of Tramadol and Omeprazole were continued. [R. 672].

On October 11, 2017, after moving to Florida, Plaintiff was seen at Emery Neuroscience Center. [R. 551]. He complained of severe pain in his upper cervical region, which had begun in July of 2017. [R. 558, 581]. It was constant and affected his normal everyday activities as well as his sleep. [R. 558]. He was diagnosed with spasmodic torticollis; complex regional pain syndrome of lower bilateral limbs, progressive, worsening; cervicalgia; and other muscle spasm. [R. 581]. A CT scan of the cervical region showed slight reversal lordosis with degenerative disc disease most notable at C6-7 eccentric to the left with a midline disc protrusion with moderate left and mild right neuroforaminal narrowing, and mild left neuroforaminal narrowing at C3-4 with the paracentral disc bulge asymmetric to the left. [R. 583-584]. Mr. Hennessey underwent occupational therapy evaluations and Botox injections. [R. 641, 642-643, 645, 647-648, 650-651,

655-656, 658-659, 661-662,664-665].

On October 30, 2017, Plaintiff was seen by Dr. Shatabdi Patel. [R. 545]. Dr. Patel diagnosed complex regional pain syndrome, chronic pain syndrome, neck pain, cervical radiculitis, displacement of cervical intervertebral disc without myelopathy, cervical facet joint pain, muscle spasm of cervical muscle of neck, low back pain, lumbosacral radiculitis, displacement of lumbar intervertebral disc without myelopathy, lumbar facet joint pain, spasm of back muscles, and spasmodic torticollis. [R. 546]. The diagnoses were associated with muscle spasms and headaches. [R. 558].

On March 26, 2018, Plaintiff was seen again at Emery Neuroscience Center. [R. 551]. Other symptoms noted by Plaintiff were swelling of hands, feet, and ankles, extreme tiredness, and extreme weakness. [R. 565]. His current medications were Baclofen, Botox, Tizanidine, and Tramadol. [R. 568-569].

On July 12, 2018, Plaintiff returned to New York to see Dr. Canty. [R. 668]. Dr. Canty noted that Plaintiff had been trying to find a pain management doctor in Florida but was unsuccessful in finding someone who was able to treat and manage his condition. [R. 668]. Plaintiff was receiving Tramadol for his pain but did not think it was helping much. [R. 668]. He said that when he has flare-ups of his leg pain, he is in severe pain for three to four days. *Id.* The SCS was working well for him, and he used it 24 hours a day. *Id.* If he turned it off, his leg immediately would swell, and the pain would go up to 9-10/10. *Id.* When he was not in a flare, his pain was 3/10. *Id.* Examination still showed tenderness/palpation from T8-L5, with limited range of motion still at 35 degrees flexion, 10 degrees extension, and 10 degrees right and left rotation. *Id.* Straight leg raise was at 70 degrees on the right. [R. 668- 669]. The diagnosis was

15

complex regional pain syndrome of the bilateral lower limbs, and RSD of lower extremity. [R. 669]. Dr. Canty stated that Plaintiff had been having poor pain control over the last several weeks with his current pain medications. *Id.* They discussed alternate treatment such as physical therapy and injections. *Id*. Dr. Canty modified Plaintiff's medication regime to now include Tramadol, Nortriptyline, Tylenol with Codeine, and Advil. [R. 670].

On October 1, 2018, Dr. Canty completed a Disability Questionnaire. [R. 733]. Plaintiff's diagnoses were RSD of lower extremity, lumbar radiculopathy, displacement of lumbar intervertebral disc, and lumbosacral spondylosis. *Id.* His prognosis was guarded. *Id.* Positive clinical findings included lumbosacral tenderness over T8-L5, SCS over right buttock, limited range of motion, antalgic gait, and positive straight leg raise at 60 degrees on the right and on the left. *Id*. Also, the bilateral lower extremities were positive for allodynia over bilateral shins, calf, and muscles on left greater than right. *Id.* Plaintiff's muscle strength was 4/5 in the left lower extremity. *Id*. The laboratory test demonstrating support for his diagnoses was the MRI of the lumbar spine with herniated nucleus polposes at L4-5 with left posterolateral radial annular tear and L5-S1 herniation. *Id.* Plaintiff's symptoms included severe pain with allodynia to touch of the back, lower extremities, shin, calf and muscles and pain over T8-L5, right greater than left, paralumbar muscles with positive straight leg raise in the lower extremities, and burning/numbness and pain in both legs/feet. [R. 734]. Dr. Canty stated that Plaintiff's symptoms and functional limitations were reasonably consistent with his impairments. *Id.* The pain was sharp, shooting, burning, radiating into his bilateral legs/feet with numbness, tingling and sensitive to touch. *Id.* The pain was constant and factors that precipitated the pain were wet/cold climate and lifting over 10 pounds. *Id.* Plaintiff's pain was in the 7-9/10 range. [R. 735]. He had

16

not been able to completely relieve the pain. *Id.* Dr. Canty again opined that, in a competitive full-time work situation, Plaintiff could only sit for one hour and stand/walk for one hour. *Id.* He could frequently lift and carry up to five pounds, and occasionally lift up to 20 pounds. *Id.* He would need to alternate between sitting and standing/walking every 10 to 15 minutes. *Id.* He was on Tramadol and Tylenol #3. [R. 737]. His pain would constantly interfere with his attention and concentration. *Id.* He was only capable of low stress work, as pain increased with stress and multi-tasking was difficult. *Id.* He would miss work more than three times per month. [R. 738].

### C.  ALJ's Decision

The ALJ issued his decision on Plaintiff's Claim for benefits on October 23, 2018. [R. 7]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 7-9]. He then found that Plaintiff suffered from the severe impairments of cervical and lumbar degenerative disc disease and complex regional pain syndrome of the lower extremities. [R. 12]. He found that Plaintiff could perform a limited range of sedentary work, except he could never climb ladders, ropes or scaffolds, never crawl, and occasionally climb ramps and stairs; occasionally balance, stoop, kneel, and crouch; and must avoid exposure to extreme cold, wetness and humidity. [R. 13]. As such, he could not perform his past work as a police officer. [R. 16]. However, based on the VE's testimony, Plaintiff could perform the jobs of call out operator, document preparer, and stuffer. [R. 17]. As such, he was not disabled. [R. 18]. In making that determination, the ALJ gave consultative examiner Dr. Basnayake's determination that Plaintiff had moderate limitations for prolonged standing, walking, climbing, bending, lifting, carrying, and kneeling, "great weight." [R. 15]. With regard to treating physician, Dr. Canty's opinion, the ALJ gave "good weight" to his earlier statements that Plaintiff could perform

sedentary work. [R. 16]. However, with regard to Dr. Canty's later statement indicating more severe functional limitations, the ALJ found this statement to be "not consistent" with Plaintiff's daily activities, ability to travel back to New York to see Dr. Canty, and level of pain medication he was taking. *Id.* The ALJ also found that Plaintiff's allegations of limitations of pain were not entirely consistent with the medical evidence and other evidence in the record. [R. 16].

The ALJ concluded that Plaintiff was not under a disability, as defined by the SSA, from the alleged onset date through the date last insured. *Id.*

## II.    MOTIONS FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment, Plaintiff argues that the ALJ did not properly evaluate the opinions of the treating pain management physician, Dr. Canty. [DE 14]. In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law [DE 19], he asserts that substantial evidence supports the ALJ's decision and the ALJ applied the correct legal standards.

## III.    RELEVANT LAW

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting

*Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's residual functioning capacity, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

## IV.   <u>LEGAL ANALYSIS</u>

Plaintiff argues that the ALJ did not give sufficient weight to his treating physician. The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440. "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so.

*Id.*[2]

The ALJ gave "good weight" to statements contained within three pages of the medical records provided by the treating physician, Dr. Canty. [R. 16]. The ALJ explained that these statements were "consistent with the overall medical evidence of the record." *Id.* However, the ALJ did not describe the weight he gave, if any, to the remaining medical records and opinions of Dr. Canty, including his ultimate and recent conclusions regarding the severity of Plaintiff's disability. [R. 14-16]. To that end, the ALJ found that Dr. Canty's medical source statements, where Dr. Canty opined that Plaintiff could sit zero to one hours, stand/walk zero to one hours, and occasionally lift up to twenty pounds during the course of an eight-hour workday, were inconsistent with Plaintiff's self-reported activities of daily living recorded by Dr. Basnayake and inconsistent with Plaintiff's hearing testimony. [R. 16]. The ALJ also noted that Plaintiff, after moving to Florida for the climate, was able to travel back to New York three to four times a year in order to be treated by Dr. Canty. *Id.* Lastly, the ALJ described that Plaintiff testified to being able to manage his pain with "lower level pain medications, i.e., Tramadol and Tylenol 3." *Id.*

On the other hand, the ALJ gave "great weight" to the opinion of Dr. Basnayake, a physician who examined Plaintiff one time on December 27, 2016. [R. 15, 529-532]. The ALJ afforded the opinion of Dr. Basnayake "great weight" because she "performed a complete examination and her conclusions are consistent with her clinical examination, the rather significant activities of daily living that claimant performs, the use of lower level pain medications, as well as with the overall medical evidence of the record." [R. 15]. The ALJ also gave "some weight to

---

[2] The Court notes that the law on the deference to give treating physicians has changed, but only for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. Here, Plaintiff's claim was filed prior to March 27, 2017.

the opinions of State Agency physicians." [R. 16] Thus, the ALJ concluded that while Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." *Id.*

The Court has reviewed the ALJ's decision and finds that the ALJ did not state with particularity the weight he gave to different medical opinions and the reasons why, as required. Although the ALJ described the weight given to Dr. Canty's statements within three pages of the record as "good weight," the ALJ failed to state with particularity, or even at all, the weight given to the vast number of remaining statements provided by Dr. Canty and the reasons why such weight would be given. The ALJ also did not establish good cause for not giving substantial weight to Plaintiff's treating physician's opinions, which were not inconsistent with the entire record.

The ALJ reasoned that the limitations described by Dr. Canty in the remaining records were inconsistent with Plaintiff's testimony and with Plaintiff's self-reported activities of daily living reported to Dr. Basnayake. [R. 16]. The ALJ also explained that the limitations described in Dr. Canty's later statements contradicted the doctor's own statements within the medical record that Plaintiff would be able to perform sedentary work with no lifting over five to ten pounds. *Id.* However, the Court finds that the limitations described by Dr. Canty were, in fact, consistent with Plaintiff's testimony, Plaintiff's self-reported activities of daily living reported to Dr. Basnayake, and with Dr. Canty's own medical records.

Plaintiff described his daily activities as getting his kids ready for school, preparing their lunches and breakfast, and driving his children to school, if he is able. [R. 40]. Plaintiff also described his activities as running errands when he is able, helping his kids with their homework,

and trying to attend his children's events, if they have any. *Id.* Plaintiff further testified to having to take a nap every day from 12:00 pm to 1:00 pm due to exhaustion. *Id.* Plaintiff also stated that when he is in pain, and starts thinking about the pain, Plaintiff cannot concentrate on any task at hand. *Id.* Plaintiff described similar daily activities to Dr. Basnayake including bathing, cleaning, cooking, childcare, shopping, and laundry. [R. 530]. The record also details the extent of physical exertion that some of these activities require, which was not inquired into at the hearing nor mentioned in the ALJ's decision. Plaintiff's cooking consists of "quick meals, sandwiches-no prolonged standing . . . no longer able to stand for long period in front of stove - cut vegetables." [R. 162]. Additionally, Plaintiff does not perform all of the household shopping or chores himself. Plaintiff's wife goes shopping with him and Plaintiff's wife does "all outdoor work – mowing, snowblower" due to Plaintiff's pain in his back, legs, and feet. [R. 162-63].

Dr. Canty's Medical Source Statements, which the ALJ found inconsistent with Plaintiff's previously mentioned testimony, state that Plaintiff could sit zero to one hours, stand/walk zero to one hours, and lift/carry up to twenty pounds occasionally during the course of an eight-hour workday. [R. 735]. Dr. Canty also stated that Plaintiff would be absent three or more times a month, that Plaintiff would need to alternate positions every ten to fifteen minutes in order to relieve pain, and that Plaintiff's impairments are likely to produce good and bad days. [R. 536, 539, 736, 738]. The ability of the Plaintiff to perform household chores, consisting of making his children quick lunches, driving his children to school when Plaintiff is able, doing laundry, and running errands is not inconsistent with Plaintiff's inability to perform at a job five days a week for eight hours each day.

Moreover, other courts within the Eleventh Circuit have held that performing simple

household chores is not necessarily inconsistent with disability. *See Cook v. Commissioner*, 653
F. Supp. 2d 1245, 1255 (M.D. Fla. 2009) ("The activities of daily living that he testified to at the
hearing were very limited: some driving, very few household chores, some grocery shopping, some
reading, going to church once a month, and bathing himself, activities which do not require
sitting/standing/walking for specified periods of time or lifting certain weights frequently. The
doctor's conclusion as to the likelihood of Plaintiff missing multiple days of work is also not
inconsistent with his ability on some other days to perform limited daily activities and occasional
driving.") (internal citation omitted). The ALJ also found inconsistent Plaintiff's ability to travel
to New York three to four times a year to be treated by Dr. Canty. The ability to travel one day,
for potentially two to three hours by flight from Florida to New York, is not inconsistent with Dr.
Canty's medical source statements. Plaintiff may get up and move from his sitting position, walk
the aisles, and be free to move about the cabin. The ability to travel three to four times in total each
year for medical treatment does not equate to being able to work five days a week for eight hours
each day.

Additionally, the ALJ found that Plaintiff testified to managing his pain "with lower level
pain medications." The ALJ cites to no page in the record to support this statement. Plaintiff never
states that he is able to manage his pain with Tramadol and Tylenol #3. In fact, the record supports
the conclusion that Plaintiff was not able to find much relief with these medications. Plaintiff
returned to Dr. Canty on July 12, 2018 because he was unsuccessful finding someone in Florida
that was able to treat and manage his condition and Plaintiff felt that Tramadol was not "doing
much for him." [R. 668]. Furthermore, the ALJ cited to a page within this section of the record to
support his finding that Dr. Canty contradicted his own statements. The ALJ focuses on the fact

that Dr. Canty stated three times in the record that Plaintiff was "[a]ble to perform sedentary work." [R. 312, 456, 686]. Yet, the ALJ left out the remaining portion of the disability degree. For example, Dr. Canty stated that Plaintiff would miss more than 3 days of work per month [R. 738], a fact which the VE stated would mean that Plaintiff could do none of the jobs listed by the VE [R. 44], yet the ALJ failed to adequately consider or address this issue. The record itself states that Plaintiff has a marked partial disability with "[n]o lifting over 5-10 pounds. Able to perform sedentary work, perhaps *with freedom to change positions*, etc." [R. 686] (emphasis added).It seems that the ALJ picked certain portions of the record favorable to his decision to deny benefits, and ignored or failed to address other relevant portions of the record.

Moreover, Dr. Canty was free to change his opinion of Plaintiff's ability to perform sedentary work. Although the SCS has helped reduce Plaintiff's pain to a manageable level, Plaintiff still experiences flare ups. [R. 39, 41]. The flare ups give Plaintiff severe pain for three to four days until the pain subsides. [R. 668]. Additionally, in Plaintiff's most recent visit to Dr. Canty on the record, Plaintiff rated his pain at a VAS 3/10. *Id.* Although Plaintiff mentioned these flare ups at the hearing, the ALJ did not inquire into Plaintiff's flare ups or, as noted above, give any weight or consideration to the testimony of the vocational expert concerning Plaintiff's potential absences. [R. 41]. The VE testified that if someone were to be absent two to three time per month on an unscheduled basis, no jobs would be available for the individual to perform. [R. 44]. In addition to absences, the vocational expert also testified that if someone were to be off task 15% of the day due to frequent breaks, no jobs would be available for the individual to perform. *Id.* This testimony of the VE was not sufficiently addressed or considered by the ALJ.

Thus, it is clear from the record that Dr. Canty's opinions and statements support the

conclusion that Plaintiff could sit zero to one hours, stand/walk zero to one hours, and occasionally lift up to twenty pounds during the course of an eight-hour workday. Dr. Canty's previous statements and change of opinion regarding Plaintiff's ability to perform sedentary work are not inconsistent with Dr. Canty's own medical records nor are they unsupported by evidence in the record. In fact, Plaintiff was seen by multiple physicians, as established in the record, all of whom examined Plaintiff and diagnosed Plaintiff with similar conditions described by Dr. Canty. [R. 426, 256-57, 263, 269, 522, 525].

Dr. Canty's findings are also not inconsistent with the opinion of Dr. Basnayake. Dr. Basnayake stated that Plaintiff "has moderate limitation for prolonged standing, walking, climbing, bending, lifting, carrying, and kneeling." [R. 532]. Dr. Basnayake also diagnosed Plaintiff with "lower back pain" and "[r]eflex sympathetic dystrophy of both lower legs mid calf down, including ankle and feet." *Id.* Further, she stated that Plaintiff "walks with a very mild limp in the right leg" and that Plaintiff used no devices for assistance and needed no help changing or getting onto the exam table. [R. 530]. Dr. Basnayake's report also states that Plaintiff "complains of burning pain in both lower legs, mid-calf down. He is in constant pain. Pain scale 4 to 5/10." [R. 529]. Plaintiff's capacity to dress himself and move around in a short period of time without difficulty is not inconsistent with Dr. Canty's opinion of Plaintiff's inability to work a full work week and sit/stand zero to one hours a day. Notably, Dr. Basnayake's examination does not describe Plaintiff's efforts to relieve his pain or the amount of times Plaintiff has to move per day in order to avoid the burning sensation in his legs. Accordingly, the opinions of Dr. Basnayake and Dr. Canty are neither contradictory nor inconsistent with each other.

Therefore, the Court finds that the ALJ erred by not giving controlling weight to the treating

physician, Dr. Canty, without good cause. Additionally, the ALJ erred in that he did not state with particularity the weight he gave to Dr. Canty's later and remaining opinions, nor did he give reasons why such weight would be given. Further, the ALJ failed to adequately consider the VE's testimony that no jobs would be available to Plaintiff if he missed more than 3 days per month or was off task 15% of the day, or how the VE's opinion in that regard was informed by Dr. Canty's opinion and the record as a whole. To the contrary: Dr. Canty's opinions were bolstered by the evidence on the record and his opinion was not conclusory or inconsistent with the remaining records medical records.

As noted above, Step four of the Social Security regulations involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). In Plaintiff's case, the ALJ found that he could not perform his past relevant work. Therefore, a *prima facie* case of disability was established for Plaintiff in this case. The burden then shifted to the ALJ to show at step five that, despite the Plaintiff's impairments, he is able to perform work in the national economy in light of the claimant's residual functioning capacity, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239.   The ALJ failed to meet his burden in this regard. Accordingly, the ALJ's decision is due to be reversed.

### V.    CONCLUSION

The Court finds that the record does not contain substantial evidence to support the denial of benefits to Plaintiff. Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.   The decision of the Commissioner is **REVERSED AND REMANDED** pursuant to

sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion**.** Because the Commissioner's final decision is not based on substantial evidence, on remand, the Commissioner should reassess the entire record and reconsider and weigh all available medical records and medical opinion evidence.

2. Accordingly, Plaintiff's Motion for Summary Judgment [DE 14] is hereby **GRANTED**, and Defendant's Motion for Summary Judgment [DE 15] is hereby **DENIED**.

3. Judgment will be entered separately.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 25th day of March 2021.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE